IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| KEFA GARY, | : |
| Plaintiff, | : |
| v. | : Civil No. 1:19-cv-15017 (RBK/KMW) |
| | : **OPINION** |
| AMERICAN BREAD COMPANY, LLC d/b/a PANERA BREAD; and John Does 1-5 and 6-10, | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

This case is about an employer's noncompliance with the New Jersey Family Leave Act ("NJFLA"). Plaintiff, an employee at a Panera franchise owned by Defendant American Bread Company, became pregnant and took maternity leave. Her supervisor contacted her during her maternity leave to schedule Plaintiff's return, which Defendant determined was twelve weeks from Plaintiff's start of leave per the Family Medical Leave Act ("FMLA"), a federal statute. Defendant did not acknowledge or appear to know about NJFLA, a state statute that provides additional time off for family care including after birth. Plaintiff expressed interest in coming back to work but struggled to find regular childcare. After trying to return to work and then taking an absence to care for her newborn, Defendant fired her. Plaintiff was terminated before her statutorily protected time off would have run out.

Presently before the Court is Defendant American Bread Company, LLC's Motion for Summary Judgment (Doc. No. 42). Defendant argues that Plaintiff chose to return to work early and that allotting her more leave would not have changed the outcome, seeing as she did not

1

acquire fulltime childcare until she would have run out of leave. But Plaintiff's subsequent choices do not change Defendant's disregard of her right to NJFLA leave. This Court cannot divine what Plaintiff might have done had Defendant given her the statutorily protected time to acquire childcare.

Plaintiff withdraws the gender discrimination count of her complaint, so we grant summary judgment to Defendant with respect to that count only. Defendant's motion is **DENIED** with respect to all other counts.

## I. BACKGROUND

*Employment*

Plaintiff Kefa Gary began working for Defendant American Bread Company LLC d/b/a Panera Bread ("Defendant") on August 1, 2013 as an associate and cashier at the Shrewsbury, New Jersey Panera café. (Doc. No. 42-3, Defendant's Statement of Undisputed Material Facts ("Def. St. Mat. Facts") ¶ 9). Plaintiff was promoted to a Shift Supervisor on or about November 29, 2016, and she held that position for the remainder of her employment with Defendant. (*Id.* ¶ 14). Lisa Curry, Plaintiff's District Manager, oversaw part of Plaintiff's employment and considered Plaintiff to be a "very good worker." (*Id.* ¶ 15).

*Pregnancy and leave*

On or about August 23, 2018, Plaintiff notified Defendant that she became pregnant and provided a corresponding doctor's note to Renee Guimaraes, the then-General Manager of the Shrewsbury café. (*Id.* ¶¶ 14, 17). The note stated "[i]t is medically advised . . . that [Plaintiff] is allowed a 15 minute break every 4 hours." (Doc. No. 42-5, Exh. 7). Plaintiff testified that she did not get these advised breaks because the café was busy and there was no one to whom to report the lack of breaks. (Doc. No. 42-5 Exh. 3, Deposition of Kefa Gary ("Pl. Dep." 57:14-58:15). In

2

November 2018, Plaintiff notified Defendant of her request for a leave of absence beginning on February 20, 2019, her expected due date. (Doc. No. 48-2, Plaintiff's Statement of Facts ("Pl. St. Facts") ¶ 4). The parties agree that Plaintiff followed Defendant's policies and procedures in requesting an absence for maternity leave. (*Id.* ¶ 5).

Defendant maintains a written policy about family leave; Plaintiff testified that she is aware of such policies but did not say when she became aware of them. (Pl. Dep. 45:16-46:10). While Defendant's employees were familiar with leave under the Family Medical Leave Act ("FMLA"), they testified that they did not know what the New Jersey Family Leave Act ("NJFLA") was or what protections it offered. (Pl. St. Facts ¶ 49).

By letter dated January 3, 2019, Defendant requested Plaintiff submit her physician paperwork for FMLA leave approval, (*Id.* ¶ 8), stating that:

> If approved, the FMLA leave will permit you to take off work up to 12 weeks based on medical necessity for your own medical condition. Please note that there is no paid leave available to you through the company. You will be paid any vacation time you have available to you at the time of your leave.

(Doc. No. 42-5, Exh. 8; Pl. St. Facts ¶¶ 6-7). The correspondence did not reference the NJFLA or provide any NJFLA information or paperwork to Plaintiff. (Pl. Stat. Facts ¶¶ 10-12). Plaintiff's doctor completed Plaintiff's FMLA paperwork on February 5, 2019. (Doc. No. 42-5, Exh. 12). The doctor stated that Plaintiff's period of incapacity would be from February 20, 2019 to May 1, 2019. (Doc. No. 42-5 Exh. 2, Deposition of Christine Fagan ("Fagan Dep.") 16:21-62:25).

In January 2019, Plaintiff notified Defendant of her need to take a leave of absence due to her high-risk pregnancy. (Def. St. Mat. Facts ¶¶ 19-20). Plaintiff's last day of work prior to her maternity leave was January 23, 2019, and she gave birth on February 15, 2019. (Def. St. Mat. Facts ¶¶ 22-23). On March 13, 2019, Defendant notified Plaintiff via letter that her leave of absence under the FMLA had been approved for the twelve-week period of January 23, 2019 to April 17,

3

2019. (Doc. No. 42-5, Exh. 14). Defendant reminded Plaintiff to take any unused vacation time while out on FMLA leave. (*Id.*). In the letter, Defendant did not notify Plaintiff that she was eligible for additional leave under NJFLA. (*Id.*; Fagan Dep. 63:1-64:25). Defendant had calculated the leave schedule based on twelve weeks from when Plaintiff began her leave and did not include the leave schedule prescribed by NJFLA, which is at least twelve weeks from date of birth and in some circumstances taken sequentially with FMLA leave. (Fagan Dep. 62:2-64:17).

*Return to work*

Defendant replaced Plaintiff's position at some point in March 2019, and Ms. Curry told Plaintiff that the Shrewsbury location "already had enough managers so she had nowhere to put [Plaintiff]." (Pl. St. Facts ¶ 33). On March 25, 2019, five weeks after the birth and while Plaintiff was taking maternity leave, Lisa Curry, District Manager for Defendant, contacted Plaintiff to discuss Plaintiff's return to work. (Pl. St. Facts ¶ 29). Via text message, Plaintiff and Ms. Curry arranged to meet at Defendant's Wall location on April 1, 2019. (Pl. Dep. 81:9-82:7). At the meeting, Plaintiff stated she wanted to return to work "[s]ooner than later, because [she] needed income." (*Id*. 82:15-18). Curry offered "to demote [Plaintiff] from a supervisor to an associate" at a lower salary because Plaintiff had a baby and "can't complete the supervisor shifts." (Pl. Dep. 83:5-19; Pl. St. Facts ¶ 34).

On April 7, Plaintiff emailed Defendant's human resources representative because she had still not received temporary disability benefits related to her childbirth and recovery. (Pl. St. Facts ¶ 36). The representative responded stating that the human resources part of the temporary disability benefits application was submitted on March 13, 2019. (Doc. No. 48-5, Exh. M).

On April 9, Ms. Curry texted Plaintiff to ask if Plaintiff has considered the offer. (Pl. Dep. 82:19-25). Plaintiff replied, "Hey Lisa, yea I thought about it it's really no benefit for me only

4

towards the company so I rather not take the offer [demoting to associate]." (*Id.* 84:10-13). Ms. Curry replied, "I am sorry you see it that way. Full availability is needed to be a Shift Supervisor and the higher pay rate is offered to match the level of responsibility." (*Id.* 84:24-85:4; Doc. No. 42-5, Exh. 16). Curry further noted that the lower associate "rate would allow [Plaintiff] to get tips" making the effective rate "close to $13/hour," and that the "[b]enefit to [Plaintiff] was easing back into [her] role with a little less responsibility." (*Id.* 85:4-10). Ms. Curry then texted "I am sorry to see you go as you have worked hard on your professional development during your time with Panera and I feel there was more and new opportunities for you in the future. Good luck in your future and enjoy that beautiful baby boy. Best, Lisa." (*Id.* 85:12-17). Plaintiff understood these messages to mean that she still had time to return to work by "easing back into [her] role." (*Id.* 86:24-87:18). She texted back stating that "as a supervisor is full time and I can't accommodate that right now," meaning that with her newborn infant she would have to get childcare situated first. (*Id.* 88:11-89:1).

Ms. Curry called Plaintiff and they came to an agreement whereby Plaintiff would try working a few shifts at the Wall location, which was less busy and was closer to her home than the Shrewsbury location. (*Id.* 90:6-22). Plaintiff describes this location change as made unilaterally by Defendant. (Pl. St. Facts ¶ 32). In her deposition, Plaintiff acknowledged that she did not object to the move and that it was beneficial to her. (Pl. Dep. 123:3-124:9). On April 12, 2019, Ms. Curry sent a text message to Plaintiff stating that "Evelyn [Diaz, the General manager of the Wall café] is going to call [Plaintiff] about [her] new schedule soon HR needs your release from doctor. You can fax to Kristen," with the fax number. (Pl. Dep. 89:18-90:9; Doc. No. 42-5 Exh. 16).

On April 16, 2019, Diaz asked Plaintiff via text message if "[Plaintiff] ha[d] any requests off for period 5 schedule." (Def. St. Mat. Facts ¶ 35). Plaintiff replied, "May 2 and the 15." Ms.

5

Diaz then inquired as to whether Plaintiff was available to work Saturday, May 11, 2019. Plaintiff replied that she could not, because she did not have childcare. (*Id.*). Plaintiff, with the understanding that her statutory protection for maternity leave had run out and that she had to report to work, worked as a Shift Supervisor in Wall on April 22 and 23, 2019. (*Id.* ¶¶ 36-37; Pl. Resp. Mat. Facts ¶ 38). At the end of the April 23 workday, Plaintiff told Diaz that she would not be able to come back to work until she got her childcare situation set up. (Pl. Dep. 99:23-101:9.) On April 25, 2019, Plaintiff notified Ms. Diaz via text message that she "won't be able to come in until next week [she had] to get a baby sitter." (Doc. No. 42-5, Exh. 18). Plaintiff told Ms. Diaz that she would let Ms. Diaz know as soon as she could, and that she was going to "look[] at a few day cares today." (*Id*). As of April 27, 2019, Plaintiff did not have any updates and Ms. Diaz informed Plaintiff that Plaintiff would be kept off the schedule until she was available, and Plaintiff replied that she will "keep [Diaz] posted." (*Id*).

On May 3, 2019, Ms. Diaz told Plaintiff via text message that she "need[ed] the store key" from Plaintiff, who held a store key as Shift Supervisor. (*Id.*; Pl. Dep. 103:11-13). Plaintiff returned the store key to Ms. Diaz because she was not working and was kept off the schedule due to her inability to secure childcare. (Pl. Dep. 103:22-104:24). When returning her store key on May 3, 2019, it was Plaintiff's understanding that her employment with Defendant ended. (*Id.* 107:3-5). Upon receiving the keys, Ms. Diaz stated, "it's best if we let you go," and Plaintiff interpreted that statement as termination. (*Id.* 107:8-10). Ms. Diaz told Defendant's leadership that Plaintiff has "quit" because "she didn't have a babysitter for he [sic] newborn child. She did not prove [sic] a resignation letter." (Doc. No. 42-5, Exh. 19). Defendant concedes that the May 3, 2019 conversation was in fact a termination. (Def. St. Mat. Facts ¶ 10).

6

Plaintiff obtained childcare in August 2019. (*Id.* 107:18-23). Plaintiff did not contact Defendant about returning to work after she secured childcare because Defendant had fired her. (*Id.* 107:24-108:5). After obtaining childcare, Plaintiff enrolled as a full-time student at Brookdale Community College in September 2019. (*Id.* 125:13-126:6). At this time, Plaintiff began searching for part-time employment. (*Id.* 126:7-12). On September 4, 2019, Plaintiff began working as a part-time employee at We Care Adult Care in Red Bank, New Jersey. (*Id.* 129:16-130:22).

*Procedural history*

On June 3, 2019, Plaintiff filed a complaint in the Superior Court Burlington County, New Jersey. (Doc. No. 42-5, Exh. 20.) On July 10, 2019, the action was removed by Defendant from the Superior Court of Burlington County, New Jersey to the United States District Court for the District of New Jersey. (Doc. No. 1). Plaintiff presently brings the following claims: (1) violation of the New Jersey Family Leave Act ("NJFLA") for interference and wrongful discharge; (2) violation of the New Jersey Law Against Discrimination ("NJLAD") for wrongful termination on the basis of pregnancy; and (3) violation of the NJLAD for post-termination retaliation. Plaintiff seeks punitive damages. On May 28, 2021, Defendant filed the present Motion for Summary Judgment. (Doc. No. 42).

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The

party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)). The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. DISCUSSION

#### a. NJFLA interference

The NJFLA provides that an employee having a child can take twelve weeks of leave commencing any time within a year of date of birth. N.J.S.A. 34:11B-4(c). This time runs consecutive to FMLA leave: a mother can take FMLA time for pregnancy-related disability and then an additional twelve weeks for newborn care under NJFLA. *See* N.J.A.C. 13:14-1.6(b) ("If

an employee first takes FMLA leave because of his or her own disability, including a disability related to pregnancy or childbirth, the employee would be entitled to an additional 12 weeks of leave within 24 months under the Act to care for … newly born … child, because the prior disability leave was taken for a purpose not covered by the NJFLA."). NJFLA violations can give rise to civil lawsuits for damages including punitive damages not greater than $10,000 for individual plaintiffs. N.J.S.A. 34:11B-11.

Here, Plaintiff was entitled to FMLA leave for whatever time it took to recover from childbirth and care for her newborn, up to twelve weeks from when she started that leave. After she recovered from childbirth, she was entitled to twelve weeks of NJFLA leave. At the very least, she was entitled to twelve weeks of NJFLA leave from the date of her child's birth: leave until May 10, 2019.

In New Jersey, it is unlawful for an "employer to interfere with, restrain or deny the exercise of, or the attempt to exercise, the rights provided under this act or to withhold the benefits provided for under this act." N.J.S.A. 34:11B-9(a). One basis for a claim of interference is failure to notify. *See, e.g., O'Donnell v. BH Media Grp., Inc.*, No. 16-5192, 2018 U.S. Dist. LEXIS 86997, at *17-18 (D.N.J. May 24, 2018) ("A reasonable juror could find that had Defendant fully and accurately explained to O'Donnell her leave rights under the NJFLA, she would have asked Defendant to designate all of her post-birth leave time as NJFLA leave."). Employers have an obligation to "not only display notice of its employees' rights and obligations, but also must 'use other appropriate means to keep its employees so informed.'" *D'Alia v. Allied-Signal Corp.*, 614 A.2d 1355, 1359 (N.J. Super. Ct. App. Div. 1992) (citing N.J.S.A. 34:11B-6). "It is incumbent upon the employer to apprise the employee of his or her rights and to effectuate them once the employee requests a leave of absence for any of the reasons provided by the Act." *Id.*

9

Here, there are facts in dispute as to what kind of notice Defendant provided to Plaintiff. Plaintiff's manager reached out to her in the middle of her maternity leave – five weeks after giving birth – and arranged to meet with Plaintiff and set out her schedule to return. Defendant had represented to Plaintiff in writing that her only approved leave was through April 17, 2019. No manager or supervisor told Plaintiff that she could take additional leave afterward under NJFLA. In late April, Plaintiff was absent from work due to her need to locate childcare. Defendant's response to the absence was termination—a termination that occurred May 3, while Plaintiff was still entitled to leave under NJFLA. It is plausible that a jury would find that Defendant's representations about April 17 being the end of Plaintiff's possible maternity leave constitute interference with Plaintiff's NJFLA rights. It is also plausible that a jury would find that Defendant's manager contacting Plaintiff five weeks after birth and arranging an in-person meeting at the café while Plaintiff was supposed to be on leave constituted interference with NJFLA. It is also plausible that Defendant's choice to fill Plaintiff's position with someone else as early as March 2019 constituted interference with NJFLA. It also is plausible that a jury would find that termination of a new mother during her statutorily protected leave constitutes interference with NJFLA.

Defendant argues that notice was sufficient because Plaintiff testified that she was familiar with NJFLA. Defendant relies on the following testimony from Plaintiff's deposition:

> Q: So my question is, do you remember getting –the handbook got updated, as is shown here on the top right, in September of 2017. So that would have been about two years after you were working there the second time. Do you remember getting—do you remember a time when the company updated the handbook?
> A: No.
> Q: Okay. That's fine. But did you have a chance to become familiar with the policies when you first started working there. Right?
> A: Yes.
> Q: Did you know that in the handbook there were written policies providing for leave of absence under what's called the federal FMLA?

10

> A: Yes.
> Q: Did you know in the handbook there is a section devoted to New Jersey employees?
> A: Yes.
> Q: And did you know that the section directed to New Jersey employees had written policies allowing for leaves under the New Jersey Family Leave Act?
> A: Yes.
> Q: And did you know there was a mechanism in the handbook for employees to make complaints if they felt like they were being discriminated against or being treated unfairly in the workplace?
> A: Yes.

(Pl. Dep. 45:6-46:16).

Testimony from Plaintiff that she was at some point aware that the handbook contained a section about NJFLA does not, as a matter of law, absolve Defendant of Defendant's other conduct discussed above that could constitute interference. Moreover, Defendant has not explained how the language in the handbook as a matter of law meets the notice requirements of NJFLA, seeing as the NJFLA requires a conspicuous display of the employees' rights and obligations in addition to other appropriate means. N.J.S.A. 34:11B-6.

Defendant avers that Plaintiff was never denied leave, but that is true only up to April 23, 2019. On April 23, Plaintiff told a manager that she was looking for possibly daycare centers and would notify the manager once she succeeded. Defendant laments that Plaintiff did not sufficiently communicate with her manager after that, but Defendant does not explain what more Plaintiff was supposed to do in order to not get fired during her NJFLA leave. It is plausible that a jury could construe the May 3 termination as a denial of leave and an interference with NJFLA leave. Summary judgment for Defendant would not be appropriate.

### b. Wrongful discharge and wrongful termination claims

Plaintiff's complaint contains claims for wrongful discharge under NJFLA and wrongful termination on the basis of pregnancy under NJLAD. The parties have briefed these claims

11

together under the *McDonnell Douglas* burden-shifting analysis. 411 U.S. 792, 802 (1973); *accord Andersen v. Exxon Co.,* 446 A.2d 486, 490 (N.J. 1982).

*Prima facie case*

The burden on Plaintiff to state a *prima facie* case is articulated somewhat differently for the NJFLA and NJLAD claims. To establish a *prima facie* case of wrongful discharge under the NJFLA, Plaintiff must show: (1) she took leave under the NJFLA, (2) she suffered an adverse employment decision; and (3) the adverse decision was causally related to her leave. *See Wolpert v. Abbott Labs.*, 817 F. Supp. 2d 424, 439 (D.N.J. 2011) (requiring such a showing for wrongful discharge under FMLA). Here, Plaintiff was eligible for leave under the NJFLA, tried to take time for childcare, and was terminated for her absence, so she has stated a *prima facie* case.

To establish a *prima facie* case of wrongful termination on based on pregnancy under the NJLAD, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) who was qualified for and performing the essential functions of the job; (3) and who nevertheless suffered termination or other adverse employment action; and (4) the alleged adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *Swingle v. Henderson*, 142 F. Supp. 23 625, 633 (D.N.J. 2001); *Schiavo v. Marina Dist. Dev. Co., LLC*, 123 A.3d 272, 284 (N.J. Super. Ct. App. Div. 2015). Here, only the fourth element is in dispute. The termination occurred because Plaintiff took an absence for childcare—an absence that was statutorily guarded by NJFLA. Termination for the exercise of maternity leave could give rise to an inference of intentional discrimination for that leave. *Accord Rymas v. Princeton Healthcare Sys. Holding, Inc.*, No. 15-8188, 2017 U.S. Dist. LEXIS 178103, at *19-20 (D.N.J. Oct. 27, 2017) ("Plaintiff was terminated fifty days after returning from maternity leave . . . . a reasonable jury could conclude there was

sufficient temporal proximity between [the employee's] leave and her termination."). Plaintiff has stated a *prima facie* case under NJLAD.

Defendant's rationale for firing Plaintiff is that "Plaintiff had no intention of returning to work and had taken no steps whatsoever to preserve her job." Defendant does not explain how Defendant surmised on May 3 that Plaintiff had no intention of returning to work. Defendant does not explain what additional steps Plaintiff owed Defendant to preserve her job, seeing as Defendant already knew that Plaintiff had given birth fewer than twelve weeks before firing her and Defendant already knew that the given reason for Plaintiff's absence was childcare.

The fact that Plaintiff had intermittently tried to return early from maternity leave does not change the causal relationship between Plaintiff's April 23 absence for childcare and the termination. Defendant has not argued that Plaintiff waived the balance of her NJFLA leave when she tried to return to work. Indeed, Plaintiff's attempt to return to work to earn wages is unsurprising, seeing as Defendant caused a delay in Plaintiff's temporary disability payments by not submitting the paperwork until March 13, more than six weeks after Plaintiff had begun her FMLA leave.

*Defendant's burden to show a legitimate, non-discriminatory and/or non-retaliatory reason*

The burden then shifts to Defendant to articulate a legitimate, non-discriminatory and/or non-retaliatory reason for discharging Plaintiff. *McDonnell Douglas*, 411 U.S. at 802. Defendant has not done so. Defendant states that "Plaintiff's separation was the result of her early return from leave, followed by her own admissions that she could no longer work due to her lack of childcare for her baby." But NJFLA allows new mothers like Plaintiff to be absent for childcare of their newborn. Absence for childcare is not a legitimate, non-discriminatory, non-retaliatory reason to fire an employee if the employee is owed NJFLA leave during that time.

13

Defendant states repeatedly in briefing papers that Plaintiff did not secure childcare until August 2019. To the extent Defendant is suggesting that their discriminatory reason for termination (NJFLA leave for childcare) converts into a nondiscriminatory reason upon a showing that Plaintiff could have been fired for a nondiscriminatory reason some point afterward, we disagree.

### c. violation of the NJLAD for post-termination retaliation

Plaintiff brings a claim for post-termination retaliation in violation of NJLAD. The factual basis for this claim is Defendant's misrepresentations to the New Jersey Department of Labor in the course of Plaintiff's application for unemployment benefits. Defendant filed an "appeal" of Plaintiff's unemployment eligibility around October 2019, about four months after Defendant was served with the complaint; Plaintiff characterizes this appeal as baseless and retaliatory. Defendant does not address these allegations in the motion for summary judgment or any subsequent papers. Without any explanation put forth as to why summary judgment would be appropriate, we deny the motion.

### d. Punitive damages

Defendant asks this Court to strike Plaintiff's claim for punitive damages. Punitive damages are appropriate upon a showing of a defendant's willful or reckless choices, which can include omission or inaction. *Rendine v. Pantzer*, 661 A.2d 1202, 1215 (N.J. 1995) ("[T]he requirement of willfulness or wantonness may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.") (citation omitted). Where there are material facts in dispute regarding Defendant's willfulness or recklessness, punitive damages are a matter for the jury, not summary judgment. *See Pichler v. Unite*, 542 F.3d 380, 390 (3d Cir. 2008). Here, there are facts

in dispute as to whether Defendant's conduct was willful or reckless. Plaintiff has proffered facts suggesting that Defendant supervisors interfered with Plaintiff's NJFLA leave. It is plausible that a jury would find Defendant's termination of Plaintiff during her NJFLA leave willful or reckless, so we leave the matter of punitive damages to the jury.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 42) is **GRANTED** with respect to Count Three (Gender Discrimination) and **DENIED** with respect to all other counts. An order follows.

Dated: 11/17/2021

/s/ Robert B. Kugler
ROBERT B. KUGLER
United States District Judge